[730 NYS2d 48]

ARK BRYANT PARK CORP., Respondent-Appellant, v BRYANT PARK RESTORATION CORP., Defendant, and CITY OF NEW YORK et al., Appellants-Respondents.

First Department, August 23, 2001

### APPEARANCES OF COUNSEL

*Arthur M. Handler* of counsel, New York City (*Robert S. Goodman* and *David S. Goldstein* on the brief; *Handler & Goodman, L. L. P.,* attorneys), for respondent-appellant.

*John Hogrogian* of counsel, New York City (*Pamela Seider Dolgow* and *John L. Hunt* on the brief; *Michael D. Hess, Corporation Counsel* of New York City, attorney), for municipal appellant-respondent.

*Jack Hassid,* New York City, for Council of Fashion Designers of America, Inc. and another, appellants-respondents.

### OPINION OF THE COURT

NARDELLI, J.

In this breach of contract action, we are asked to determine whether a certain letter agreement between plaintiff Ark Bryant Park Corp. (Ark) and defendant Bryant Park Restoration Corp. (BPRC), which granted exclusive catering rights to Ark for private functions scheduled in Bryant Park, constitutes a sublicense under a "Management Agreement for Bryant Park" between defendant the City of New York (the City) and BPRC.

### *Background*[1]

Bryant Park, which is located between 40th and 42nd Streets on the east side of Sixth Avenue (the Park), New York, New York, is a public park that was designated a New York City Scenic Landmark by the Landmarks Preservation Commission in 1974. The Park, which consists of approximately 10 acres, has undergone a number of transformations and was originally utilized in 1823 as a potter's field following a yellow fever epidemic. In 1842, the Croton Aqueduct Distributing Reservoir was constructed on the land now occupied by the New York Public Library, and the land behind it became a public park in 1847, appropriately named Reservoir Square.

---

1. The historical detail set forth herein has been culled from the following sources: Burrows and Wallace, Gotham: A History of New York City to 1898, Oxford University Press (1993); The WPA Guide to New York City, The New Press (1992); Jackson, The Encyclopedia of New York City, Yale University Press (1995); Ziga, New York Landmarks, Dovetail Books (1993); *The History of Bryant Park and its Successful Redevelopment,* <http://www.courts.state.ny.us/reporter/webdocs/Bryant__Park__History.htm>.

The City staged the first World's Fair held in the United States in the Park in 1853, and in 1884, the Park was given its present name in honor of William Cullen Bryant. In 1899, the City demolished the reservoir, which had become obsolete due to the City's burgeoning population, and began construction on the present Public Library building, which was officially opened on May 24, 1911. A period of decline began in the 1920's, which was prompted by the effects of the construction of the Sixth Avenue subway. By the 1970's, the Park was the site of open drug dealing and was used as a haven for drug addicts and a refuge for the homeless.

## The Contracts

In 1980, the New York Public Library and the Rockefeller Brothers Fund formed BPRC, a not-for-profit corporation devoted to the restoration and long-term maintenance of the Park as a public asset. On July 29, 1985, the City and BPRC executed a contract denominated "Management Agreement for Bryant Park" (the Management Agreement), section 3 of which provides that "[t]he City hereby engages BPRC to provide, and BPRC agrees to provide * * * management services for the Park, and the City does hereby grant to BPRC the exclusive license and privilege to operate and manage the Park * * * so long as BPRC shall maintain the Park as a public park, in accordance with the purposes of this Agreement, upon the terms and conditions herein contained." Section 5 notes that simultaneously with the execution of the Management Agreement, the City, BPRC and the Library were entering into a separate agreement entitled "Terrace Agreement," which leased a portion of the Park known as the "West Terrace" to BPRC with the understanding that BPRC would construct and operate a structure at that location, the subsurface area of which would be used for library stacks, and the surface area as a restaurant.

Section 17 of the Management Agreement, entitled "Concessions; Visitors Services," defines "Visitors Services" as, *inter alia*, "the operation of any restaurant or cafeteria" and "any service or facility intended for the sale of souvenirs, food, beverages * * * goods or services." Section 17 (b) of the Management Agreement provides:

"The City hereby grants BPRC the exclusive right to operate and maintain Visitors Services in the Park (including the Department [of Parks and Recreation]'s interest in bordering sidewalks), and

to sublicense others to do so subject to the provisions of this Section 17. The license granted under this Section 17 shall extend from the Commencement Date for the Initial Term or for such longer period as the Commissioner may determine, *provided that this license shall be revocable at will at any time by the Commissioner upon thirty (30) days' notice*" (emphasis added).

Section 17 (c) of the Management Agreement provides that the license granted to BPRC "will be sublicensed by BPRC to the Operator, with respect to the serving of food and drink and the provision of such other Visitors Services as BPRC and the Operator may provide." Section 17 (d) states, *inter alia,* that "[n]othing contained in this Agreement shall create (or be deemed to create) any relationship of contract or agency between the City and the Operator or any Concessionaire."

BPRC closed the Park in 1988, and over the course of the ensuing four years restoration and improvements totaling approximately $8.9 million were performed on the Park. On or about September 1, 1991, BPRC and Ark entered into a lease regarding the restaurant under construction and certain kiosks located in the Park. On or about August 1, 1993, BPRC and Ark executed an agreement entitled "Restated Indenture of Lease" (the Grill Lease) which superseded the original lease. The Grill Lease, which is for a term of 20 years, gives Ark the right to operate a restaurant in the building to be constructed by BPRC, and to serve food and beverages outdoors on the West Terrace from May through September. In 1995, Ark opened the Bryant Park Grill, which includes an indoor restaurant and outdoor café, and continues to operate that facility to the present day.

Ark and BPRC also entered into a separate two-page letter agreement, on or about the same date the Grill Lease was executed, regarding catering services to be provided for functions held in the Park (the Catering Agreement). The Catering Agreement provides in relevant part, that: Ark is to be the exclusive provider of catering services for functions taking place in the Park during the term of the Grill Lease, except that BPRC shall be granted two waivers to sponsors holding affairs in the Park to use caterers other than Ark; and no waiver can be issued by BPRC to a sponsor who has previously contacted or entered into negotiations with Ark regarding catering for an event in the Park. The Catering Agreement, as required by section 17 (c) of the Management Agreement, was

approved by the Commissioner of the City Department of Parks and Recreation (the Department of Parks).

### The Current Controversy

Defendant Seventh on Sixth, Inc. (SOS) is a New York not-for-profit corporation which was formed in or about August 1993 for the purpose of sponsoring centralized fashion shows in furtherance of the interests of the apparel industry. Defendant Council of Fashion Designers of America, Inc. (CFDA) is a New York not-for-profit corporation and a trade association comprised of fashion and accessory designers located in the United States.

In or about August 1993, SOS entered into a license agreement with BPRC pursuant to which SOS was permitted to erect two large tents on the central lawn of the Park in order to conduct the aforementioned fashion shows. The events, which take place during two 16-day periods each spring and fall, have popularly become known as "The Bryant Park Fashion Shows." Once the Bryant Park Grill opened in 1995, SOS employed Ark as the exclusive caterer for the fashion shows.

BPRC granted SOS licenses to stage fashion shows in the fall of 1996 and the spring of 1997, which provided that SOS "understands that Ark has the exclusive right to provide food service in the park, and that neither [SOS] nor its licensees may use any other provider of food service in the park." However, by letter dated November 21, 1997, the Commissioner of the Department of Parks, relying on section 17 (b) of the Management Agreement, revoked BPRC's license "to the extent that it authorizes you to enter into an agreement for provision of food and beverage catering at special events in Bryant Park," effective 30 days from the date of the letter. The Commissioner's letter further noted that as a result, BPRC's sublicense with Ark (the Catering Agreement) would be null and void as of that date and that such revocation allows "anyone who obtains a special events permit in Bryant Park to purchase food and beverage catering services from a vendor of his or her choice."

Ark protested the Commissioner's revocation by letter dated December 2, 1997, maintaining that it was not a party to the Management Agreement, that the Catering Agreement had no termination provision, and that the Catering Agreement remained in effect despite the City's revocation letter. Ark contends that approximately one year later, it discovered that

BPRC had granted SOS a waiver to hire outside caterers for a fashion event to be held February 15-18, 1999, and that such waiver constituted a violation of the Catering Agreement. It should be noted that BPRC and SOS entered into licensing agreements, dated October 22, 1998 and January 27, 1999, for fashion shows to be held in the fall of 1998, and the spring of 1999, respectively. These agreements, which postdated the City's revocation letter, no longer refer to Ark as the exclusive caterer for such events.

## The Present Litigation

Ark initially commenced an action against the Department of Parks, BPRC and CFDA by the service of a summons and complaint on or about June 29, 1999, and on August 13, 1999, it served an amended complaint, albeit without the court's permission, purporting to add SOS as a party defendant. Ark thereafter elected to discontinue that action, without prejudice, apparently because it had neglected to serve the City with a notice of claim.

Ark subsequently commenced the within action on October 8, 1999 by the service of a summons and complaint, and amended that complaint in November 1999 in order to substitute the City as a defendant in place of the Department of Parks. The current complaint interposes three causes of action: the first cause of action sounds in breach of contract and seeks an injunction enjoining defendants from authorizing or permitting any third-party sponsor of events in the Park to utilize a caterer other than Ark; the second cause of action alleges breach of contract on the part of BPRC and the City and seeks monetary damages as the result of such breach; and the third cause of action seeks to recover monetary damages against SOS and CFDA for their purported tortious interference with the Catering Agreement.

## The Motions to Dismiss

The City, SOS and CFDA moved, the latter two jointly, to dismiss the complaint, pursuant to CPLR 3211 (a) (7), for failure to state a cause of action. BPRC answered the complaint and interposed a counterclaim for indemnification against its codefendants, and thereafter moved to dismiss the complaint, pursuant to CPLR 3211 (a) (7), for failure to state a cause of

action,[2] or, in the alternative, for a declaration that, in the event it is held liable, it is entitled to indemnification from its codefendants.

The City and BPRC contended that the Catering Agreement was a sublicense granted to Ark by BPRC which was rendered null and void when the City revoked BPRC's license, and therefore the sublicense, pursuant to section 17 (b) of the Management Agreement. The City noted that it is not a party to the Catering Agreement, and signed it only to signify its approval, as required by section 17 (c) of the Management Agreement. The City and BPRC further maintained that BPRC could not convey greater rights than it possessed under the Management Agreement.

Ark contended that the Catering Agreement is a "stand-alone" contract between itself, the City and BPRC, which gives no indication that it is a sublicense and makes no reference to, and is therefore not subject to, the Management Agreement.

SOS and CFDA argued in support of their motion that since they were not parties to the contracts at issue, they could not be held liable for BPRC or the City's breach thereof. Moreover, SOS and CFDA maintained that they were not obligated to use Ark's catering services in light of the City's revocation of Ark's rights to provide such services. In response, Ark alleged that SOS and CFDA caused it monetary harm by using caterers other than Ark for their biannual fashion shows, while aware of Ark's exclusive right to provide such catering services, and, with regard to the claim for tortious interference with contract, that SOS and CFDA had procured the City's ultimate decision to terminate the Catering Agreement.

The motion court, by order dated September 29, 2000: denied the City's motion to dismiss the complaint; granted that branch of BPRC's motion which sought a declaratory judgment on its indemnification claim against the City, pursuant to section 19 (b) of the Management Agreement, but denied the motion to the extent it sought to dismiss the complaint; and granted CFDA's and SOS's motion to the extent of dismissing Ark's third cause of action for tortious interference with contract. The motion court initially made note that the primary issue before it was "whether plaintiff's agreement with [BPRC] to cater special events at Bryant Park is an independent, 'stand-alone' contract, or whether it is actually a sub-license by [BPRC] of its rights

---

**2.** The motion court did not address the incorrect procedural posture of BPRC's motion.

derived under [the Management Agreement]." The motion court concluded that issues of fact precluded resolution of that question. The City, SOS and CFDA appeal and Ark cross-appeals from the motion court's order and subsequent judgment, entered October 13, 2000, and we now modify that judgment to dismiss the complaint in its entirety.

## *Discussion*

Generally, on a motion to dismiss made pursuant to CPLR 3211, the pleading is to be afforded a liberal construction (*see,* CPLR 3026), and the court should accept as true the facts as alleged in the complaint, accord plaintiffs the benefit of every possible favorable inference, and determine only whether the facts as alleged fit within any cognizable legal theory (*Leon v Martinez*, 84 NY2d 83, 87-88; *Morone v Morone*, 50 NY2d 481, 484; *Sotomayor v Kaufman, Malchman, Kirby & Squire*, 252 AD2d 554; *Fischbach & Moore v Howell Co.*, 240 AD2d 157). In those circumstances where the legal conclusions and factual allegations are flatly contradicted by documentary evidence, they are not presumed to be true or accorded every favorable inference (*Biondi v Beekman Hill House Apt. Corp.*, 257 AD2d 76, 81, *affd* 94 NY2d 659; *Kliebert v McKoan*, 228 AD2d 232, *lv denied* 89 NY2d 802), and the criterion becomes "whether the proponent of the pleading has a cause of action, not whether he has stated one" (*Guggenheimer v Ginzburg*, 43 NY2d 268, 275; *see also, Leon v Martinez, supra*, at 88). Moreover, the interpretation of an unambiguous contract is a question of law for the court, and the provisions of the contract delineating the rights of the parties prevail over the allegations set forth in the complaint (*805 Third Ave. Co. v M.W. Realty Assocs.*, 58 NY2d 447, 451; *O'Donnell, Fox & Gartner v R-2000 Corp.*, 198 AD2d 154; *Manchester Equip. Co. v Panasonic Indus. Co.*, 141 AD2d 616, 618, *lv dismissed* 72 NY2d 954, *lv denied* 73 NY2d 703).

A license, within the context of real property law, grants the licensee a revocable non-assignable privilege to do one or more acts upon the land of the licensor, without granting possession of any interest therein (*Greenwood Lake & Port Jervis R. R. Co. v New York & Greenwood Lake R. R. Co.*, 134 NY 435, 440; *see also, Matter of Loren v Marry*, 195 AD2d 776, 777, *appeal dismissed* 82 NY2d 800, *lv dismissed in part and denied in part* 83 NY2d 824; *Rosenstiel v Rosenstiel*, 20 AD2d 71, 76; *see also, City of Owensboro v Cumberland Tel. & Tel. Co.*, 230 US 58, 64). "[A] license is the 'authority to do a particular act or

series of acts upon another's land, which would amount to a trespass without such permission'" (1 Dolan, Rasch's Landlord and Tenant—Summary Proceedings § 4:11, at 182 [4th ed.]).

Subdivisions (b) and (c) of section 17 of the Management Agreement specifically grant BPRC the right to sublicense other entities to provide catering services in the Park, subject to the approval of the Commissioner of the Department of Parks. Section 17 (b) also provides that any sublicense is revocable, at will, by the Commissioner on 30 days' notice. Clearly then, the Catering Agreement is the specific form of transaction contemplated by the Management Agreement, and as with the parties to a lease and sublease, we find that here the licensee, BPRC, could confer no greater rights upon Ark than those afforded BPRC by the Management Agreement (*see, Mann Theatres Corp. v Mid-Island Shopping Plaza Co.*, 94 AD2d 466, 471, *affd* 62 NY2d 930; *World of Food v New York World's Fair 1964-1965 Corp.*, 22 AD2d 278). Accordingly, BPRC was without authority to enter into an exclusive, nonrevocable 20-year catering services contract with Ark.

Ark endeavors to circumvent the foregoing conclusion by arguing that the City was a party to the Catering Agreement and, therefore, directly conveyed to Ark an exclusive, nonrevocable catering license totally distinct from the exclusive catering license the City had conveyed to BPRC in the Management Agreement. A review of the Catering Agreement, however, belies Ark's contentions.

The Catering Agreement is in the form of a letter from the Executive Director of BPRC to the President of Ark, with no indication that it was addressed to the City or that BPRC was acting on the City's behalf. The five numbered paragraphs, which set forth the substantive provisions of the Catering Agreement, create rights and obligations only for and between BPRC and Ark, with no responsibilities to be undertaken by the City. Indeed, the only reference made to the City throughout the entire Catering Agreement simply states that if any waivers of Ark's services are granted by BPRC, then it was BPRC's obligation to notify the City of such. This requirement is also found in section 17 (c) of the Management Agreement.

The final paragraph of the Catering Agreement provides, in relevant part, that "[i]f the above terms accurately represent our understanding, would you please sign all the copies of this letter enclosed herewith" after which the document is signed by the Executive Director of BPRC and, under the heading of "Accepted and Agreed to," by the Vice-President of Ark. Clearly,

by "our understanding," the Catering Agreement is referring to an understanding between BPRC and Ark. The Catering Agreement does contain the signature of Betsy Gotbaum, Commissioner of the Department of Parks, under the heading of "Approved." However, the approval of the City is necessary under section 17 (c) of the Management Agreement, and we find that the Commissioner of the Department of Parks was merely indicating her approval of the Catering Agreement in a non-party capacity.

In sum, we find no support for Ark's contentions that the Catering Agreement is not subject to the provisions of the Management Agreement, or that the Catering Agreement was a separate, "stand-alone" contract between Ark, the City and BPRC, as a plain reading of the Catering Agreement makes it abundantly clear that the City was simply acting as a public body giving its approval, as required by the Management Agreement, for the Catering Agreement to be effective.

Finally, even if we were to adopt Ark's argument that the Catering Agreement is, in reality, a City-issued, non-revocable, exclusive 20-year license to provide catering services in the Park, such license would be null and void for failing to comply with the procedures set forth in the New York City Charter for review, and approval, by the Franchise and Concession Review Committee (NY City Charter § 374; *see, Miller v City of New York*, 15 NY2d 34, 37; *see also, Friends of Van Cortlandt Park v City of New York*, 95 NY2d 623).

Accordingly, the order and judgment of the Supreme Court, New York County (Beatrice Shainswit, J.), entered October 5, 2000 and October 13, 2000, respectively, which denied defendants-appellants' motions to dismiss the complaint, except insofar as it dismissed plaintiff's claim for tortious interference with contract against CFDA and SOS, should be modified, on the law, to grant said defendants' motions and to dismiss the complaint as against said defendants, in its entirety, and otherwise affirmed, without costs. The Clerk is directed to enter judgment in favor of defendants-appellants-respondents dismissing the complaint as against them.

Motion seeking leave to strike reply brief denied.

SULLIVAN, P. J., WILLIAMS, MAZZARELLI and SAXE, JJ., concur.

Order and judgment, Supreme Court, New York County, entered October 5, 2000 and October 13, 2000, respectively, modified, on the law, to grant defendants-appellants-

respondents' motions and to dismiss the complaint as against them in its entirety, and otherwise affirmed, without costs. Motion seeking leave to strike reply brief denied.