[808 NYS2d 628]

Marosu Realty Corporation, Respondent, v The Community
Preservation Corporation et al., Appellants.

First Department, December 22, 2005

## APPEARANCES OF COUNSEL

*Certilman Balin Adler & Hyman, LLP*, East Meadow (*Edward G. McCabe* of counsel), for Community Preservation Corporation, appellant.

*Michael A. Cardozo, Corporation Counsel*, New York City (*Julian L. Kalkstein* and *Larry A. Sonnenshein* of counsel), for City of New York, appellant.

*Hartman & Craven LLP*, New York City (*Stewart Louie* and *Edward L. Schiff* of counsel), for Marosu Realty Corporation, respondent.

## OPINION OF THE COURT

MAZZARELLI, J.

Plaintiff obtained funds from defendants to purchase and rehabilitate a building at 560 West 144th Street through the Participation Loan Program (PLP). One of the defendants, the Community Preservation Corporation (CPC), a nonprofit corporation, had been created in 1974 to combat the deterioration and abandonment of housing in New York City. It specialized in coordinating public and private financing for low- and middle-income rehabilitation projects and had formed the PLP with the Department of Housing Preservation and Development (HPD), pursuant to article XV of the New York State Private Housing Finance Law. The program allows municipalities, here the City of New York, to work in partnership with private lending institutions, such as CPC, to lend money to parties interested in rehabilitating deteriorating housing in economically depressed neighborhoods. Loans are offered to approved entities at below-market interest rates, to encourage investment in rehabilitation projects.

A candidate for PLP assistance must apply to the program for financing. If the application is granted, the candidate enters into a contract called the "commitment agreement" with the lenders prior to the commencement of the renovation project.

In the commitment agreement the lenders agree to provide both construction and permanent financing for the renovation. The loans are structured so that they may be converted into permanent mortgages upon completion of the renovations. Because the commitment agreement is drafted before a renovation is undertaken, it contains only estimates for many items, such as the costs of converting the loan to permanent financing and projections for rental income postrenovation.

## Plaintiff's Application for PLP Financing

In June 1989, plaintiff Marosu Realty Corporation submitted an application for a PLP loan to purchase the premises 560 West 144th Street. HPD denied the application because plaintiff and its principals had had problems with other properties that they owned. These problems included various code violations, liens, and at least one unpaid judgment. On August 25, 1989, plaintiff purchased the building itself with $35,000 in cash and a $375,000 loan from a private lender. That loan had a 15.5% interest rate.

## The PLP Loan

Marosu then resubmitted an application for a loan to refinance 560 West 144th Street. The application included representations that it had remedied the violations at its other properties. In November 1991, that request was approved. The commitment agreement between HPD and CPC as lenders, and Marosu as borrower, provided for a construction loan of $1,424,750,[1] which the parties contemplated would be converted into a permanent loan of the same amount[2] by March 18, 1993. Part of the construction loan was intended to satisfy the existing 15.5% mortgage and the remainder was for rehabilitation of the property. The commitment agreement provided that the loan would only be converted into permanent financing upon Marosu's compliance with certain conditions, which included the following:

> "1. The [renovation] [w]ork shall have been completed substantially in accordance with the Plans and Specifications to the satisfaction of Lender and Lender's engineer . . .

---

**1.** The terms of the construction loan were: $589,750 provided by federal funds at an interest rate of .25%; $464,000 provided by HPD at an interest rate of 1.25%; and $371,000 provided by CPC at the current prime rate plus 2%.

**2.** The permanent financing contemplated 0% interest on the $589,750 loan; 1% interest on the $464,000 loan; and 9.7% per annum plus a .25% financing fee on the $371,000 loan.

"3. An affidavit of [Marosu] shall have been submitted, certifying the current rent roll at the time of permanent loan closing, which rent roll shall equal or exceed the Minimum Rental Achievement [$236,767] or be at such higher level as shall be sufficient to provide at least the Minimum Debt Service Coverage [115% for CPC part of the loan; 130% for the joint CPC and HPD part of loan] . . .

"4. . . . [Marosu] shall have made application to (a) the appropriate local agencies . . . for final approval and determination of the benefits under Section 11-247 (formerly J-51 . . . tax abatement/exemption programs) . . . and such agencies shall so approve and make effective such benefits . . .

"6. [Marosu must submit proof to the lenders that] . . . the building is free and clear of all violations of the New York City Housing Maintenance Code . . . or certification that the work to remove such violations has been completed . . . ."

The agreement allowed HPD to restructure the rents to integrate the building into the rent stabilization system once the property was renovated, and included a schedule of the maximum rents plaintiff could charge for apartments after the renovation. However, those rent calculations assumed, incorrectly, that federal section 8 subsidies[3] would be available for *all* eligible tenants. The commitment agreement further conditioned conversion of the loan upon completion of the renovation by December 18, 1991 and provided that when the project was converted to permanent financing, the loan repayments would increase from approximately $38,000 to $52,000 annually. The commitment agreement provided that "[a] waiver of a breach of any of the conditions of this commitment shall not be deemed or implied to be a waiver of a subsequent breach of the same or any other provision or condition."

---

**3.** Section 8, known as the Housing Choice Voucher System, is a federal housing program which provides assistance to low-income homeowners and renters. It is administered by the national Department of Housing and Urban Development, in conjunction with individual states. To be eligible, a person must have an income below 50% of the "area median income." The program has historically been oversubscribed and applications can remain on waiting lists for years. Many state housing authorities close their waiting lists and stop accepting applications if the lists get too long. For those who receive vouchers, the assistance comes in the form of rent subsidies.

Execution of the "Buy-Sell" Agreement

On February 28, 1992, Marosu, CPC and HPD executed a document called a "Buy-Sell" agreement for the property, although the renovation had not been completed. Among other things, this agreement required Marosu, as borrower, "sufficiently in advance of the Permanent Closing Date" to "promptly and diligently":

> "(a) complete, submit and process expeditiously all documentation which may be required by HPD to complete HPD's processing procedures so as to enable HPD to issue the Certificate of Approval (Certificate of Eligibility and Reasonable Cost) setting forth the benefits of tax exemption and abatement which will be made available to the Premises upon the completion of the Work . . . ."

The agreement also obliged HPD to:

> "(c) submit all tenant applications for Section 8 [benefits] . . . to the Housing Authority, the United States Department of Housing and Urban Development and/or any other governmental agencies, and coordinate the processing of said applications with such agencies so that the applicants may receive appropriate certificates of eligibility upon completion of the [renovation work] . . . ."

The Three Notes and Mortgages

Also on February 28, 1992, plaintiff executed three construction loan mortgage notes and three mortgages[4] (the mortgage agreements): one for the $371,000 loan; a second for the $464,000 loan; and a third for the $589,750 loan. These mortgage agreements extended the deadline for completion of the renovation to December 18, 1992. Also, plaintiff agreed to accept rent at the prerehabilitation rates from any tenant declared eligible for section 8 benefits, until there was final determination as to whether such subsidies would be available to them. The mortgage agreements state that the interest rates on the loans would increase after December 18, 1992, unless Marosu: (1) completed all required improvements "in accordance with the plans and specification of the Supervising Engineer on or before [December 18, 1992]"; (2) promptly submitted all required documentation for tax abatement/

---

4. Three separate notes and mortgages were necessary because there were three different lenders.

exemption benefits; and (3) was ready, willing, and able to convert to permanent financing.

Events Preceding the Lawsuit

Approximately two years after the December 18, 1992 deadline, on December 7, 1994, the renovation was certified as "substantially complete." However, the property was never completely renovated and was never fully code compliant. Nevertheless, on December 26, 1996, HPD issued Marosu a certificate of eligibility for a permanent J-51 tax abatement/exemption.

Meanwhile, between 1994 and 1996 the federal government drastically curtailed funding for section 8 housing. As a result, benefits were not available for tenants in plaintiff's building. However, optimistic that more federal funds would become available, HPD issued rent restructuring orders for plaintiff's building. In September 1996, HPD sent Marosu's management company a letter identifying a number of tenants who were theoretically eligible for section 8 benefits. A month later, HPD issued initial rent restructuring orders for those tenants. At approximately the same time, HPD received numerous complaints from tenants about the condition of the building. HPD asserts that it then advised Marosu that no tenant's rent could be increased until all of the code violations in the apartments were remedied. It claims it gave numerous oral cautions to Marosu of this fact and there is also one letter from HPD to Marosu in the record reflecting this warning.

Thereafter, in violation of the mortgage agreements, plaintiff raised the rents of all of the eligible section 8 tenants beyond prerestructuring rates, and brought eviction proceedings against those tenants who did not pay the higher rents. Aware that Marosu was having financial difficulties, HPD and CPC attempted to obtain financial help for Marosu from the New York City Housing Development Corporation (HDC). HPD and CPC secured a "preliminary letter of interest" from HDC to refinance the property. Sometime later, in the fall of 1997, defendants met with plaintiff and offered to restructure the existing loans. The proposed modification would have lowered plaintiff's annual debt service from $52,385 to $26,577, thus increasing the amount available for maintenance and operations from $162,590 to $172,416[5] annually.

Plaintiff claims that as a precondition of the refinancing defendants required it to undertake approximately $100,000 in

5. According to the City, the proposal provided that of $1,424,750 in original financing, $589,750 would remain as federal funds requiring 0% interest.

additional renovations. CPC states that "no such cost figure was ever discussed." In any event, plaintiff represented that it would study the proposal and get back to HPD. Instead, in October 1997, plaintiff brought this lawsuit asserting the following eight claims:

1. Defendants failed to convert the construction loans into permanent mortgages as required by contract;

2. Defendants failed and refused to help plaintiff meet the minimum rents of $236,767 per year;

3. Defendants failed to secure federal section 8 subsidies;

4. By failing to achieve the minimum rents of $236,767, defendants prevented plaintiff from converting the construction loan mortgages into permanent mortgages;

5. Defendants did not meet their requirements of either increasing the collectible rents or modifying the repayment terms of the HPD portion of the permanent loan;

6. Defendants "methodically, intentionally, and maliciously precipitated" Marosu's default;

7. CPC was not entitled to accelerate its loan;

8. CPC should be enjoined from finding Marosu to be in default.

In April 1998, plaintiff stopped making payments under the notes. CPC declared the loans in default pursuant to the terms of the mortgage agreements, and by letter dated July 14, 1998, CPC called the entire principal sum due. CPC also brought a foreclosure proceeding which was later consolidated with plaintiff's action, and the building was placed under receivership. HPD and CPC separately moved for summary judgment dismissing plaintiff's complaint. CPC also moved for summary judgment on its foreclosure action, and for dismissal of Marosu's defenses.

The IAS Court's Decision

The IAS court granted dismissal of plaintiff's first cause of action, and it denied plaintiff's request for punitive damages on the second through sixth causes of action. It denied the remainder of both defendants' motions for summary judgment. This appeal ensued.

---

While HPD's share at 1% interest had previously been $464,000, that amount was increased under the proposal to $649,000. HPD agreed to eliminate any principal payment on its share, reducing those payments from $9,568 to$6,490.The $371,000 CPC portion was reduced to $186,000 and the interest on this portion of the loan would have decreased from 9.7% to 7.02%.

Discussion

The court properly dismissed plaintiff's first cause of action. The evidence is uncontested that plaintiff did not meet the preconditions for converting the construction loans into permanent financing. According to the plain terms of the commitment and the mortgage agreements, Marosu was required to complete the renovation of the building and to render it code compliant prior to December 18, 1992. Failure to do so allowed CPC to "declare the indebtedness evidenced and secured by the Note[s] and Mortgage[s] immediately due and payable" according to the terms of the construction loan agreements. While plaintiff contends that HPD and CPC attempted to frustrate Marosu's completion of the renovation, the record shows that the opposite is true. It reveals that defendants assisted Marosu in managing the payments required to complete the project, even after the deadline for conversion of the loans had passed, and in exploring alternative financing.

The third cause of action, regarding section 8 subsidies, should also have been dismissed. The federal government, not HPD or CPC, has unfettered discretion to determine the amount of funding to provide under this program. Thus, no contractual language could have compelled or enabled defendants to obtain these subsidies for plaintiff's tenants. To the extent that HPD was required to apply for section 8 benefits, Marosu does not argue that HPD failed to meet this obligation. Accordingly, there is no basis upon which to hold defendants responsible for the federal government's decision not to provide enough section 8 subsidies for the tenants in Marosu's building.

We also dismiss the second, fourth and fifth causes of action, which allege that defendants prevented plaintiff from attaining the minimum rents of $236,767 per year. First, the claims are not applicable to CPC, a private, not-for-profit corporation which never had any power to regulate rents, or any duties with respect to rents in the contracts. As to HPD, the commitment and mortgage agreements state that HPD, at its sole discretion, could "either increase the collectable rents and/or modify the repayment terms of the permanent loan."

HPD complied with its contractual obligations to alternatively either increase the rents at 560 West 144th Street or restructure Marosu's loan. In October 1996, with the rehabilitation of the building substantially complete and with knowledge of the unavailability of the requested section 8 subsidies, HPD commenced the rent restructuring process by sending letters to the

tenants. In response, HPD received numerous complaints about the maintenance of the building, including documented code violations which Marosu never corrected, although it was obliged to do so. Recognizing that Marosu was in financial trouble, HPD also attempted to secure a less onerous refinancing agreement for the project through HDC. This was action well beyond the scope of its contractual obligations. Notwithstanding HPD's voluntary efforts, it is uncontested that plaintiff persistently failed to meet its obligations. Accordingly, we dismiss plaintiff's claims regarding rent restructuring and refinancing (*see 805 Third Ave. Co. v M.W. Realty Assoc.*, 58 NY2d 447, 453 [1983] [provisions of the contract delineating the rights of the parties prevail over the allegations in the complaint]; *accord Ark Bryant Park Corp. v Bryant Park Restoration Corp.*, 285 AD2d 143, 150 [2001]).

Moreover, defendants' voluntary efforts on plaintiff's behalf do not constitute a waiver of any of plaintiff's duties under the contracts. Both the commitment agreement and the mortgage agreements had "no-waiver" clauses, which unambiguously stated that the excusal of any one provision would not constitute a waiver of any of the parties' other rights and obligations. The record is plain that defendants did not excuse plaintiff from its obligations under the contracts (*see Republic Natl. Bank of N.Y. v Olshin Woolen Co.*, 304 AD2d 401 [2003]). Further, the record provides no support for the contention that defendants intentionally relinquished their right to repayment under the commitment agreement and the mortgage agreements (*see Seigel v Seigel*, 268 AD2d 226, 227 [2000]).

Plaintiff's sixth cause of action, which alleges that defendants "methodically, intentionally, and maliciously precipitated a default by Marosu of the commitment and construction loan mortgages," is similarly without merit. Every contract contains an implicit covenant of good faith and fair dealing (*Dalton v Educational Testing Serv.*, 87 NY2d 384, 389 [1995]) and this record convincingly shows that defendants complied with this obligation in the course of their dealings with plaintiff. In fact, the events preceding the lawsuit reveal that HPD and CPC were patient with plaintiff's delays, and that they went beyond the scope of the agreements to try to help the renovation project succeed. For example, when the construction loan did not close by December 18, 1991, defendants could have terminated their commitment to the project. They did not. When plaintiff failed to submit a tax exemption and abatement application to

HPD within 35 days after December 18, 1992, CPC could have declared the mortgages immediately due and payable. However, CPC did not immediately move for foreclosure. When plaintiff failed to satisfy the conditions precedent to conversion to permanent financing by March 18, 1993, defendants could have declared the construction loan immediately due and payable. Instead of pursuing this course, defendants attempted to work with plaintiff, to prevent a default. That this ultimately proved unsuccessful was not a result of defendants' interference with plaintiff's work.

Finally, as it is undisputed that Marosu defaulted on its mortgages, and as it failed to raise an issue of fact on any of its affirmative defenses, we dismiss plaintiff's seventh and eighth causes of action, and we grant CPC summary judgment in its action for foreclosure (*see e.g. State Bank of Albany v Fioravanti*, 51 NY2d 638 [1980]; *Bercy Invs. v Sun*, 239 AD2d 161 [1997]).

Accordingly, the order of the Supreme Court, New York County (Harold B. Beeler, J.), entered September 15, 2003, which granted defendants' motions to dismiss plaintiff's first cause of action and its claim for punitive damages, should be modified, on the law, to dismiss the remainder of the complaint, and to grant defendant Community Preservation Corporation summary judgment on its claim for foreclosure of the mortgages on the subject property, and otherwise affirmed, without costs. The Clerk is directed to enter judgment accordingly.

BUCKLEY, P.J., ELLERIN, CATTERSON and McGUIRE, JJ., concur.

Order, Supreme Court, New York County, entered September 15, 2003, modified, on the law, to dismiss the remainder of the complaint, and to grant defendant Community Preservation Corporation summary judgment on its claim for foreclosure of the mortgages on the subject property, and otherwise affirmed, without costs. The Clerk is directed to enter judgment accordingly.