[874 NYS2d 97]

Amy L. Roberts et al., on Behalf of Themselves and All Others Similarly Situated, Appellants, v Tishman Speyer Properties, L.P., et al., Respondents.

First Department, March 5, 2009

APPEARANCES OF COUNSEL

*Wolf Haldenstein Adler Freeman & Herz LLP*, New York City (*Alexander H. Schmidt, Daniel W. Krasner* and *Eric B. Levine* of counsel), for Amy L. Roberts and others, appellants.

*Bernstein Liebhard & Lifshitz, LLP*, New York City (*Robert J. Berg, Ronald J. Aranoff* and *Hanna R. Neier* of counsel), for Margaret Carroll, appellant.

*Skadden, Arps, Slate, Meagher & Flom LLP*, New York City (*Jay B. Kasner, Scott D. Musoff* and *Christopher R. Gette* of counsel), and *Belkin Burden Wenig & Goldman LLP*, New York City (*Sherwin Belkin* and *Magda Cruz* of counsel), for Tishman Speyer Properties, L.P., and another, respondents.

*Greenberg Traurig, LLP*, New York City (*Daniel J. Ansell* and *Steven Kirkpatrick* of counsel), for Metropolitan Insurance and Annuity Company and another, respondents.

*Borah, Goldstein, Altschuler Nahins & Goidel, P.C.*, New York City (*Jeffrey R. Metz* of counsel), for Community Housing Improvement Program, Inc., and another, amici curiae.

*Rosenberg & Estis, P.C.*, New York City (*Jeffrey Turkel* of counsel), for Rent Stabilization Association of NYC, Inc., amicus curiae.

*Steven Banks, The Legal Aid Society*, New York City (*Alan Canner* of counsel), for Legal Aid Society, amicus curiae.

*Jimmy Yan*, New York City, for Office of the Manhattan Borough President, amicus curiae.

## OPINION OF THE COURT

NARDELLI, J.

This appeal raises an issue of statutory construction regarding the luxury decontrol provisions of the Rent Stabilization Law (Administrative Code of City of NY §§ 26-504.1, 26-504.2) and, specifically, whether the motion court properly determined that the phrase "by virtue of" is equivalent in meaning to "*solely* by virtue of," thereby leading to the incongruous result of prohibiting landlords from decontrolling certain regulated units if they are subject to rent stabilization solely by virtue of New

York City's J-51 tax abatement program (*see* Administrative Code § 11-243 [formerly § J51-2.5] [the J-51 program]) but, on the other hand, allowing landlords to decontrol the same category of units which are subject to rent stabilization for one or more reasons in addition to their participation in the J-51 program.

## Overview

Plaintiffs, current and former tenants of apartments in the Peter Cooper Village/Stuyvesant Town Complex (the Complex), commenced this putative class action in January 2007, asserting that their apartments, which had been subject to the protections afforded by the Rent Stabilization Law (Administrative Code of City of NY, tit 26, ch 4), had been improperly deregulated. Two months prior to the commencement of this action, the Complex had been purchased, for approximately $5.4 billion, by defendant PCV ST Owner LP, the general partner of which is defendant Tishman Speyer Properties, L.P. (the Tishman defendants), from defendant Metropolitan Tower Life Insurance Company, the successor by merger to defendant Metropolitan Insurance and Annuity Company (the Met Life defendants).

The Complex was originally developed in the 1940s by Met Life with the laudable goal of providing affordable housing for middle-income families. The Complex, the largest of its kind in New York City, covers approximately 80 acres, or a full 10 city blocks, between First Avenue and Avenue C, and 14th Street and 23rd Street, and consists of 110 apartment buildings comprising 11,200 units, which house at least 20,000 people.

Met Life, in order to finance the development of the Complex, entered into an agreement with the City of New York pursuant to the New York Redevelopment Companies Law, which is now codified as article V of the Private Housing Finance Law. The agreement provided Met Life, inter alia, with considerable assistance in acquiring the designated land and necessary financing, and afforded it a real estate tax exemption for 25 years. In 1974, the New York State Legislature enacted an amendment to the Real Property Tax Law which provided that upon expiration of the 25-year tax exemption, real property taxes payable on the Complex would be phased in over a 10-year period, and, in connection therewith, the apartment units in the Complex would become subject to the New York City Rent Stabilization Law.

In 1992, Met Life applied for and began receiving property tax benefits under New York City's J-51 tax abatement program,

which provided incentives for owners to rehabilitate and improve their buildings. One of the caveats of the J-51 program was that the rent deregulation of residential units in buildings receiving J-51 abatements was prohibited. Met Life and the successor owners of the Complex have received approximately $24.5 million in real estate tax benefits since entering the program, and are scheduled to remain in the program, and to continue to receive additional tax abatements, until 2017.

Plaintiffs now allege that more than 25% of the Complex's units, or an estimated 3,000 apartments, have been illegally deregulated under the high-rent/high-income decontrol provisions of the Rent Stabilization Law, because those same provisions specifically prohibit deregulation during the period in which the owner is receiving J-51 tax benefits. Plaintiffs seek, inter alia, recovery of rent overcharges for the four years preceding commencement of the action, attorney's fees, and a judgment declaring that their apartments are subject to the Rent Stabilization Law and that all the apartments in the Complex will continue to be subject to rent stabilization for the duration of time in which defendants receive J-51 tax benefits.

Defendants maintain, among other things, that the prohibition against deregulation for apartments enrolled in the J-51 tax benefit program applies only to those apartments that are rent stabilized *solely because* of J-51, and that apartments that were already rent stabilized when they were enrolled in J-51 may be luxury decontrolled prior to the expiration of, and despite the fact that the owners are continuing to receive, tax benefits. In support of their argument, defendants rely on the New York State Division of Housing and Community Renewal's (DHCR) regulations, as well as DHCR Fact Sheet 36, together which stand for the proposition that the exception to luxury decontrol for properties receiving J-51 tax benefits only applies when an apartment is subject to rent stabilization "solely by virtue of" the receipt of J-51 tax abatements (*see* Rent Stabilization Code [9 NYCRR] § 2520.11 [r] [5] [i]; [s] [2] [i]).

Defendants, by separate notices of motion, subsequently moved to dismiss the complaint, pursuant to CPLR 3211 (a) (1) and (7),[1] on the basis of documentary evidence and for failure to state a cause of action. The motion court, by judgment entered August 23, 2007, granted the motions and dismissed the

---

1. Defendants also raised lack of capacity to sue, res judicata and statute of limitations arguments in their motion papers, but have not addressed those issues on appeal.

complaint. In doing so, the court adopted the DHCR's view that the term "by virtue of" means for "the sole reason" of and concluded that since the Complex became subject to "rent stabilization in 1974 pursuant to the [Private Housing Finance Law], 18 years before applying for J-51 tax benefits, defendants did not become subject to rent stabilization [solely] by virtue of receiving J-51 tax benefits" (2007 NY Slip Op 32639[U], *15, *11). The court, noting that the Legislature neglected to amend the statute after the DHCR promulgated its regulations, concluded that the Complex is therefore not exempt from the high-rent/high-income decontrol provisions of the Rent Stabilization Law, despite receiving J-51 tax abatements. We disagree and reverse.

### The Statutory and Regulatory Framework

The New York State Legislature, in 1955, in an endeavor to improve and maintain the urban housing inventory, enacted the predecessor to Real Property Tax Law § 489, which authorized cities to promulgate local laws that would provide multiple dwelling owners with tax incentives to rehabilitate their properties or convert them to residential use. In accordance therewith, the City of New York, in 1960, adopted Administrative Code § J51-2.5 (now Administrative Code § 11-243), the objective of which was to "reward[ ] residential major capital improvement, moderate rehabilitation and conversion projects with real property tax exemption and abatement benefits" (*Matter of 31171 Owners Corp. v New York City Dept. of Hous. Preserv. & Dev.*, 190 AD2d 441, 443 [1993]).

Administrative Code § 11-243 (i) (1)[2] provides that the benefits of the J-51 program are limited to the owners of buildings that are subject to rent stabilization, rent control or the Private Housing Finance Law. The Rules of the City of New York likewise require a building receiving J-51 benefits to be subject to rent regulation for the duration of the period in which such benefits are received (28 RCNY 5-03 [f] [1]).[3] The

---

**2.** "i. The benefits of this section shall *not* apply:
  "(1) . . . to any existing dwelling which is not subject to the provisions of the emergency housing rent control law or to the city rent and rehabilitation law or to the city rent stabilization law or to the private housing finance law or to any federal law providing for supervision or regulation by the United States department of housing and urban development" (emphasis added).

**3.** "In order to be eligible to receive tax benefits under the Act and for at least so long as a building is receiving the benefits of the

Legislature, in 1985, amended RPTL 489 so as to allow rent regulation to continue after expiration of the J-51 benefits until the first vacancy thereafter, unless the lease contains a prominent notice informing the tenant that rent regulation will expire when the tax benefits expire, and the approximate date thereof (RPTL 489 [7] [b] [2], as amended by L 1985, ch 289, § 2; Administrative Code § 26-504 [c], as amended by L 1985, ch 288, § 7; *see Matter of Bleecker St. Mgt. Co. v New York State Div. of Hous. & Community Renewal*, 284 AD2d 174, 176 [2001], *lv denied* 97 NY2d 606 [2001]). Finally, the J-51 program is administered by the New York City Department of Housing Preservation and Development (HPD), which promulgates regulations to implement the program (*id.* at 175; *see also Marosu Realty Corp. v Community Preserv. Corp.*, 26 AD3d 74 [2005]).

The Rent Stabilization Law (RSL) was enacted by the New York City Council in 1969 (*see* Administrative Code of City of NY § 26-501 *et seq.*) in response to a continuing housing shortage as well as the need to regulate buildings previously omitted from rent control laws. The goal of the RSL was to encourage future housing construction by allowing owners to implement reasonable rent increases; to prevent the exaction of "unjust, unreasonable and oppressive rents"; and to "forestall profiteering, speculation and other disruptive practices" (RSL § 26-501; *see Drucker v Mauro*, 30 AD3d 37, 40 [2006], *lv dismissed* 7 NY3d 844 [2006] [the "policy of the statute is to provide an adequate supply of affordable housing in the City of New York"]; *Pultz v Economakis*, 40 AD3d 24, 27 [2007], *affd* 10 NY3d 542 [2008] ["the statute's intent (is) to provide affordable and stable housing to New York City residents"]).

The RSL applies, in pertinent part, to: multiple dwellings not owned as cooperatives or condominiums, completed and ready for occupancy after February 1, 1947 and before March 10, 1969, subject to certain delineated exceptions (RSL § 26-504 [a]); multiple dwellings made subject to the law by the Emergency Tenant Protection Act of 1974 (ETPA) (RSL § 26-504 [b]);[4] and "[d]welling units in a building or structure receiving the

_____

Act, except for dwelling units which are exempt . . . pursuant to paragraph (2) below, all dwelling units in buildings or structures converted, altered or improved shall be subject to rent regulation pursuant to [inter alia, the NY City Rent and Rehabilitation Law (Administrative Code § 26-401 *et seq.*) or the Rent Stabilization Law of 1969 (Administrative Code § 26-501 *et seq.*)]."

4. The State Legislature, in 1971, in an effort the DHCR once characterized as an "experiment with free-market controls" (*Matter of KSLM-Columbus Apts. v New York State Div. of Hous. & Community Renewal*, 6 AD3d 28, 32

benefits of section 11-243 [i.e., J-51 benefits] or section 11-244 of the code or article eighteen of the private housing finance law" (RSL § 26-504 [c]). The RSL expressly acknowledges that a building may be subject to its provisions for more than one reason and states that when both J-51 and another basis concurrently require rent stabilization, the expiration of the J-51 benefits has no effect on the other:

> "[I]f such dwelling unit would have been subject to this chapter or the [ETPA] in the absence of this subdivision, such dwelling unit shall, upon the expiration of such benefits, continue to be subject to this chapter or the [ETPA] *to the same extent and in the same manner as if this subdivision had never applied thereto*" (RSL § 26-504 [c] [emphasis added]).

In 1993, the Legislature, having found that the current system of rent regulation was not equitable to either tenants or owners because the system in place disproportionately benefitted "high income tenants" whose rent should not be subsidized, and that no housing emergency existed with respect to apartments renting for more than $2,000 per month (*see* Mem of Senator Kemp Hannon, Bill Jacket, L 1993, ch 253, at 10-11), enacted the Rent Regulation Reform Act (RRRA) (L 1993, ch 253, § 6) to amend, inter alia, the RSL. The new sections of the RSL provided for the deregulation of residential units that became vacant with a legal regulated rent of $2,000 or more per month (Administrative Code § 26-504.2) or had a legal regulated rent of $2,000 or more per month and whose tenants and occupants had a total annual income in excess of $250,000 for each of the two preceding calendar years (Administrative Code § 26-504.1).

---

[2004], *affd as mod* 5 NY3d 303 [2005]), and which was subsequently vilified in a State Assembly debate as having caused "outrageous damage" (*id.*), enacted the Vacancy Decontrol Law (L 1971, ch 371), which released newly vacated apartments from rent regulation. The "experiment," however, was short-lived and the State Legislature, in 1974, once again recognized the need for rent regulation due to an "acute shortage of housing accommodations caused by continued high demand" and that tenants "are being charged excessive and unwarranted rents and rent increases" (McKinney's Uncons Laws of NY § 8622 [L 1974, ch 576, sec 4, § 2]) and, accordingly, enacted the Emergency Tenant Protection Act (L 1974, ch 576, § 4, as amended [Uncons Laws § 8621 *et seq.*]). The Court of Appeals, in *La Guardia v Cavanaugh* (53 NY2d 67, 74-75 [1981]), characterized the ETPA "not [as] a rent and eviction regulating law," but as "an enabling act, which empowered New York City . . . to extend rent stabilization."

The high-rent or luxury decontrol provisions of the RRRA, as amended in 1997, now exclude housing accommodations from the scope of the RSL when either: the legal regulated rent is $2,000 or more and the combined household income exceeds $175,000 for two consecutive years (RSL § 26-504.1) or the tenant vacates the apartment and the legal rent, plus vacancy increase allowances and increases permitted for landlord improvements, is $2,000 or more (RSL §§ 26-504.2, 26-511[c] [5-a]). The foregoing decontrol provisions, however, are subject to the following exception:

> "Provided, however, that *this exclusion shall not apply to housing accommodations which became or become subject to this law (a) by virtue of receiving tax benefits pursuant to section [421-a] or [489] of the real property tax law*, except as otherwise provided in subparagraph (i) of paragraph (f) of subdivision two of section [421-a] of the real property tax law, or (b) by virtue of article seven-C of the multiple dwelling law" (RSL §§ 26-504.1, 26-504.2 [a] [emphasis added]).

As discussed above, the J-51 program was enacted pursuant to RPTL 489.

### DHCR Interpretation and Regulations

The DHCR,[5] as set forth in the Omnibus Housing Act passed by the Legislature in 1983, is vested with the responsibility of administering the New York City Rent Stabilization Law and rent control laws (*see 459 W. 43rd St. Corp. v New York State Div. of Hous. & Community Renewal*, 152 AD2d 511, 511 [1989]). In Operational Bulletin 95-3, dated December 18, 1995, the DHCR, tracking the language of the exception to the high-rent decontrol provisions, stated that "[t]hese high rent/high income deregulation provisions shall not apply to housing accommodations which are subject to rent regulation by virtue of receiving tax benefits pursuant to sections 421-a or 489 of the Real Property Tax Law, until the expiration of the tax abatement period."

Shortly thereafter, in an opinion letter dated January 16, 1996, the Assistant Commissioner of the DHCR accepted a reading of the exception language urged by counsel for the Tishman

---

**5.** Although the DHCR is not a party herein, defendants place a great deal of reliance on its interpretation of the statutes in question.

defendants as a feasible alternative. Under that interpretation, the statutory exception is restricted to those having accommodations that became, or become, subject to the RSL for "the sole reason" of receipt of J-51 tax abatement benefits, and not to those housing units that receive those abatement benefits but are also subject to the RSL for other reasons. The Assistant Commissioner noted that the introducer's memorandum in support of the RRRA is "silent on the issue" of the meaning of the phrase "by virtue of," and stated that the language will be construed "literally, in accordance with the ordinary meaning thereof." The letter concluded:

> "Therefore, applying a lexicographical definition to those words, as for example is enunciated in Webster's College Dictionary, it is our opinion that their apparent meaning is synonymous to 'by reason of' or 'because of,' and that an owner is precluded from seeking Luxury Decontrol of a housing accommodation receiving 'J-51' tax abatement benefits only where the receipt of such benefits is the sole reason for the accommodation being subject to rent regulation."

The DHCR, however, also issued the following caution:

> "[I]t should be noted that where Luxury Decontrol is applied before the 'J-51' tax benefit period has expired, the abatement should be reduced proportionately. That the Legislature recognized the inherent inequity of an owner's continuing to enjoy tax benefits after decontrol is apparent from RPTL Section 489 (7) (b) (1)."

In December 2000, the DHCR adopted formal regulations that, following the analysis embodied in the 1996 opinion letter, provide that the exception to the luxury deregulation provisions does not apply unless the apartments "became or become subject to the RSL and this [Rent Stabilization] Code: (i) solely by virtue of the receipt of [inter alia, J-51] tax benefits" (9 NYCRR 2520.11 [r] [5] [i]; [s] [2] [i]). A subsequent fact sheet issued by the DHCR echoes the foregoing and states that an exception to high-rent vacancy decontrol applies to "[a]partments that are subject to rent regulation only because of the receipt by the owner of [inter alia, J-51] tax benefits."

## Statutory Interpretation

It is a well-settled principle that while the correct interpretation of a statute is ordinarily an issue of law for the courts,

"[a]n administrative agency's interpretation of the statute it is charged with implementing is entitled to varying degrees of judicial deference depending upon the extent to which the interpretation relies upon the special competence the agency is presumed to have developed in its administration of the statute" (*Matter of Rosen v Public Empl. Relations Bd.*, 72 NY2d 42, 47 [1988]; *Matter of Gruber [New York City Dept. of Personnel—Sweeney]*, 89 NY2d 225, 231 [1996]). Indeed, in those instances

"[w]here the interpretation of a statute or its application involves knowledge and understanding of underlying operational practices or entails an evaluation of factual data and inferences to be drawn therefrom, the courts regularly defer to the governmental agency charged with the responsibility for administration of the statute [and i]f its interpretation is not irrational or unreasonable, it will be upheld" (*Kurcsics v Merchants Mut. Ins. Co.*, 49 NY2d 451, 459 [1980]; *see also Matter of Madison-Oneida Bd. of Coop. Educ. Servs. v Mills*, 4 NY3d 51, 58-59 [2004]).

In contrast thereto, where, as here, "the question is one of pure statutory reading and analysis, dependent only on an accurate apprehension of legislative intent, there is little basis to rely on any special competence or expertise of the administrative agency" (*Kurcsics*, 49 NY2d at 459; *see also Matter of Belmonte v Snashall*, 2 NY3d 560, 565-566 [2004]). On such occasions, the courts are free to ascertain the proper interpretation from the statutory language and intent and may undertake the function of statutory interpretation without any deference to the agency's determination (*Matter of Albano v Board of Trustees of N.Y. City Fire Dept., Art. II Pension Fund*, 98 NY2d 548, 553 [2002]; *Gruber*, 89 NY2d at 232; *Madison-Oneida Bd.*, 4 NY3d at 59 [where the court is "faced with the interpretation of statutes and pure questions of law . . . no deference is accorded the agency's determination"]; *Matter of Moran Towing & Transp. Co. v New York State Tax Commn.*, 72 NY2d 166, 173 [1988] ["(u)ltimately . . . legal interpretation is the court's responsibility; it cannot be delegated to the agency charged with the statute's enforcement"]). Since, in this matter, the interpretation of the provisions in question requires no special competence, or understanding of underlying practices on the part of the DHCR, we find unavailing defendants' reliance on the

DHCR's regulations and opinion letter and conclude that the agency's construction of the statute is not entitled to deference.

Our analysis now shifts to the well-settled principle that in interpreting a statute, it is fundamental that a court "ascertain and give effect to the intention of the Legislature" (McKinney's Cons Laws of NY, Book 1, Statutes § 92 [a]; *see Riley v County of Broome*, 95 NY2d 455, 463 [2000]; *Matter of Astoria Gas Turbine Power, LLC v Tax Commn. of City of N.Y.*, 14 AD3d 553, 557 [2005]), and, "[a]s the clearest indicator of legislative intent is the statutory text, the starting point in any case of interpretation must always be the language itself, giving effect to the plain meaning thereof" (*Majewski v Broadalbin-Perth Cent. School Dist.*, 91 NY2d 577, 583 [1998]; *see also Flores v Lower E. Side Serv. Ctr., Inc.*, 4 NY3d 363, 367 [2005]). Moreover, "new language cannot be imported into a statute to give it a meaning not otherwise found therein" (McKinney's Cons Laws of NY, Book 1, Statutes § 94, Comment, at 190, quoted by *Matter of Raritan Dev. Corp. v Silva*, 91 NY2d 98, 104-105 [1997]), and a court, in discerning the meaning of statutory language, must "avoid objectionable, unreasonable or absurd consequences" (*Long v State of New York*, 7 NY3d 269, 273 [2006]; *Ryder v City of New York*, 32 AD3d 836, 837 [2006], *lv dismissed* 8 NY3d 896 [2007]).

Bearing the foregoing in mind, it is clear to us that the impact of the J-51 and rent stabilization statutes is that all apartments in buildings receiving J-51 tax benefits are subject to the RSL during the entire period in which the owner receives such benefits. The high-rent decontrol provisions of the RSL, which are at the crux of this matter, provide two means of excluding apartments from the coverage of the RSL when the legal rent reaches $2,000, but also provide that the decontrol provisions do not apply to housing accommodations that "became or become" subject to the RSL "by virtue of" receiving J-51 tax benefits. The parties agree that "by virtue of" means "because of" or "by reason of," and it is clear to us that such phrase does not, in ordinary language, mean that only a single cause or reason exists. Indeed, the Legislature, in numerous instances, has not hesitated to use the phrases "only by virtue of" or "solely by virtue of" when it intended to restrict a provision to a single cause. (*See e.g.* RPTL 489 [14] ["The benefits of this section shall not apply to any conversion of property to residential use where the conversion was contrary to the applicable zoning resolution and was permitted *only by virtue of a* variance as to

use" (emphasis added)]; Civil Service Law § 58 [3], Executive Law § 835 [7], and General Municipal Law § 209-q [2] [a] [each of which excludes from the definition of police officer any person "serving as such *solely by virtue of* his occupying any other office or position" (emphasis added)]; Executive Law § 247 [1] ["The division may discontinue such service at any time but shall not be required to discontinue such service *solely by virtue of* the fact that more than five probation officers are needed" (emphasis added)]; Executive Law § 390 and General Municipal Law § 445 [public employees required to wear uniforms shall not be deemed to violate any law regulating uniform appearance *"solely by virtue of* the display on the shoulder area of the sleeve of such uniform of an American flag" (emphasis added)]; Public Health Law § 4360 [1] ["An organ procurement organization shall not constitute a bank or storage facility *solely by virtue of* storing or arranging for the storage of heart valves" (emphasis added)]; Real Property Law § 232-c ["Where a tenant whose term is longer than one month holds over after the expiration of such term, such holding over shall not give to the landlord the option to hold the tenant for a new term *solely by virtue of* the tenant's holding over" (emphasis added)]; RPAPL 1523 [5] [b] ["the defendant whose right(,) title or interest will be extinguished by failure to redeem the property within the time fixed by the judgment held such right to redeem *only by virtue of* a subordinate mortgage" (footnote omitted and emphasis added)]; Tax Law § 290 [c] [2] ["Every organization whose sole unrelated trade or business carried on in New York consists of activities constituting an unrelated trade or business *solely by virtue of* section 501 (m) (2) (A) of the internal revenue code shall not be subject to tax under this article" (footnote omitted and emphasis added)].)

We also find instructive the decision of the United States Court of Appeals for the Fifth Circuit in *Demette v Falcon Drilling Co., Inc.* (280 F3d 492 [2002]), wherein the court was presented with the issue of whether an indemnity agreement between an oil drilling platform provider and its contractor was voided by the Longshore and Harbor Workers' Compensation Act (LHWCA) where the injured employee of the contractor was entitled to the benefits of the LHWCA "by virtue of" section 1333 (b) of the Outer Continental Shelf Lands Act (OCSLA) (42 USC § 1333 [b]). Having determined that the central issue in the case was the meaning of the phrase "by virtue of," the court stated that

"[t]he most obvious meaning of 'by virtue of section 1333' is simply that the worker is covered by section 1333. For example, it is perfectly sensible to say, 'Demette is eligible to receive LHWCA benefits by virtue of section 1333 and also by virtue of the LHWCA itself.' This sentence makes sense because we understand that 'by virtue of' does not imply exclusivity. The adverbs 'exclusively' or 'solely' would have indicated the meaning [third-party defendant] advocates, but those words are absent from the statute" (280 F3d at 502).

We also find that the broader interpretation of the phrase "by virtue of" urged by plaintiffs herein is more consistent with the overall statutory scheme, which makes no distinction based on whether a J-51 property was already subject to regulation prior to the receipt of such benefits. Indeed, RPTL 489 (7) (b) (2) provides that any apartment subject to rent regulation "as a result of receiving a [J-51] tax exemption or abatement pursuant to this section *shall be subject to such regulation* until the occurrence of the first vacancy of such unit after such benefits are no longer being received" (emphasis added). Correspondingly, the RSL provides that upon expiration of the J-51 tax benefit period, those apartments previously subject to regulation by other mechanisms continue to be covered "to the same extent and in the same manner as if [the J-51 benefits] had never applied thereto" (RSL § 26-504 [c]).

Finally, we find that limiting the scope of the high-rent exceptions so that apartments that receive J-51 tax benefits and are also rent-stabilized pursuant to other criteria are subject to high-rent deregulation, but apartments that are regulated solely because they receive J-51 benefits are not subject to high-rent deregulation, despite the fact that all of the units in question receive J-51 benefits, is to invite absurd and irrational results. By way of example, a high-rent unit deregulated as the result of a vacancy prior to receipt of J-51 benefits would again become subject to rent stabilization when the owner began receiving J-51 benefits and would remain exempt from the high-rent decontrol provision throughout the J-51 period. In contrast, a similar high-rent unit that was already subject to rent stabilization at the commencement of the J-51 benefits period would be subject to deregulation at any time during the J-51 period if the tenant vacated the apartment. We, however, perceive no rational basis upon which owners should be treated differently depend-

ing upon the timing of a tenant's departure. Nor is there any reason to endorse the motion court's counterintuitive outcome of allowing landlords to be exempt from rent stabilization obligations in certain building units even though they continue to receive J-51 tax abatements originally provided to the owner on the condition that the owner guaranteed its housing stock would be rent stabilized throughout the J-51 period (*see State of New York v Fashion Place Assoc.*, 224 AD2d 280, 281 [1996], *lv dismissed* 89 NY2d 917 [1996] [owners who chose to "reap (the) substantial tax benefits" of the J-51 program agreed to accept the obligations imposed by the Rent Stabilization Law while receiving the benefits]). Since there is no basis for limiting the scope of the exemption, the motion court's insertion of the word "solely" into the statute was impermissible.

Accordingly, the judgment of the Supreme Court, New York County (Richard B. Lowe, III, J.), entered August 23, 2007, dismissing the complaint, should be reversed, on the law, without costs, and the complaint reinstated.

Gonzalez, J.P., Acosta and DeGrasse, JJ. concur.

Judgment, Supreme Court, New York County, entered August 23, 2007, reversed, on the law, without costs, and the complaint reinstated.